**SHELL OIL CO., Inc., v. STATE TIRE & OIL CO. et al.**

No. 8745.

Circuit Court of Appeals, Sixth Circuit.

March 10, 1942.

972

William F. Kenney, of St. Louis, Mo., and Walter P. Armstrong, of Memphis, Tenn. (Walter P. Armstrong, of Memphis, Tenn., Geo. W. Cunningham, of Tulsa, Okl., William F. Kenney, of St. Louis, Mo., and Armstrong, McCadden, Allen, Braden & Goodman of Memphis, Tenn., on the brief), for appellant.

William A. Percy and. Walker Percy, both of Memphis, Tenn. (Bailey Walsh, Wm. A. Percy, Walker Percy, and Andrew J. Donelson, all of Memphis, Tenn., on the brief), for appellees.

Before ALLEN, HAMILTON, and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

This is an appeal from a judgment entered upon a jury verdict in favor of appellee State Tire & Oil Company, hereinafter called State Tire, which filed an action claiming that appellant, Shell Oil Company, Inc., hereinafter called Shell, unlawfully interfered with its business, depriving State Tire of many of its customers and destroying its profits. A second count in the amended complaint alleged that the contract between the parties had been wrongfully terminated by Shell, to the injury of State Tire. Fred Montesi, president of State Tire, was joined as defendant, and Shell filed a counterclaim, praying for judgment upon certain notes executed by State Tire and endorsed by Montesi and on an unpaid balance for equipment furnished to State Tire. The District Court directed a verdict in favor of Shell upon the counterclaim, and upon the second count of the amended complaint. No appeal was taken from this portion of the judgment.

Shell's principal contentions, raised by motion for directed verdict and motion for judgment duly made, relate to the facts. It is alleged that every customer which State Tire claims Shell unlawfully diverted was a Shell, and not a State Tire customer; that there is no substantial evidence of wrongful interference by Shell with State Tire's business, and that the record contains no evidence that State Tire suffered any damage by reason of the alleged interference.

■ Upon many material issues the evidence was controverted, but applying the established rule that after verdict and judgment the record must be viewed in the light most favorable to the prevailing party, we state the case as it was established by witnesses on behalf of State Tire and by the admissions of Shell's agents.

■ Prior to this controversy State Tire was a retail dealer and jobber in oil and gasoline, doing business in Memphis,

Tennessee, through eleven filling stations and a bulk depot which it owned, and handling Gulf Refining Company products exclusively. On December 5, 1934, E. S. Elliott, secretary of State Tire, acting for State Tire, signed a contract with Shell under which Shell sold gasoline to State Tire for one station and a few consumer accounts, at prices less than its established bulk depot price. This agreement, called the "Elliott contract," was executed on a routine form of employment contract; most of its provisions were entirely inapplicable to the situation of the parties, and were never enforced, the provision as to the amount of commissions to be paid by Shell being the gist of the agreement. Thereafter Shell proposed that State Tire should handle Shell products exclusively, should lease its bulk depot to Shell, in return should receive as additional compensation one-quarter of a cent for each gallon of gasoline hauled by State Tire from Shell's depot, and should continue to receive the commissions theretofore established in the Elliott contract. It was also proposed that Shell should finance the State Tire accounts and give credit to State Tire. This proposal was accepted in June, 1935, but was never reduced to writing, although a number of sales agreements for gasoline and lubricants were executed pursuant thereto. Under the contract there was no sale or transfer of State Tire's customers or good will to Shell, and it was the understanding that the good will of each of the parties was to remain the property of that party. At that time State Tire sold approximately 140,000 gallons of gasoline per month, while Shell was selling in Memphis 70,000 or 80,000 gallons per month. Under the arrangement State Tire delivered gasoline both to its old customers and those subsequently secured by State Tire, and Shell delivered gasoline to its customers. The parties operated under the agreement until July 23, 1938. After the contract was negotiated State Tire actively promoted its advertising and increased its sales until the gasoline sold to its consumer customers, exclusive of its filling-station sales, averaged approximately 180,000 gallons per month during the four months prior to July, 1938. During that period its total sales exceeded 250,000 gallons of gasoline per month.

Shortly after the contract of June, 1935, was made, Montesi learned that Shell was surreptitiously approaching State Tire customers and inducing them to sign written contracts with Shell which made no mention of State Tire. When Montesi protested to Von Allman, city manager of Shell, against this practice, Von Allman explained that because of the credit arrangement Shell's home office had to have a record of every transaction with a consumer, and that the contract was a matter of form only. Montesi asked how State Tire was going to know the consumer was State Tire's customer. Von Allman said, "You deliver to your customers, we deliver to our customers. We all know your customer." Von Allman was not called to testify, but Hickham, then district manager for Shell, does not dispute, and in substance corroborates Montesi's statements on this point. He said it was a matter of policy to take the contracts in the name of Shell because they would then be respected by the major companies which would not solicit business covered by such contracts. Hickham testified that Shell attempted during this period to make contracts with State Tire customers being served Shell gasoline. He stated that he had been instructed "to get the accounts ourselves if possible," and said in reference to Montesi's customers, "I wanted his assistance to get them to sign the contracts. * * * In my opinion they would not sign them unless he said so, being his accounts." Thereafter Montesi designated Philyaw, then one of State Tire's employees, to accompany Shell's agents and obtain the signatures of State Tire's customers on the Shell contracts, and himself assisted in the process.

In the fall of 1936 Shell leased for a period of five years certain filling station locations controlled by State Tire, and immediately sub-leased these locations to State Tire, reserving the right to cancel the sub-leases on ten days' notice. At the same time it purchased from State Tire the equipment in State Tire's filling stations.

During the period of the contract Shell secretly agreed with State Tire's largest consumer, the Yellow Cab Company, through its president, Galloway, to have Galloway at some future date become a distributor of Shell's products in Memphis under a jobber contract. The details of the arrangement were worked out in December, 1937, while Galloway was a customer of State Tire, and under a consumer contract with Shell which remained in effect until Shell terminated relations with State Tire. When difficulties arose later between State Tire and Shell, Shell's agent, DeJahm, notified Galloway a month in advance that the

arrangement with State Tire was to be cancelled, and Shell delivered gasoline directly to Galloway prior to the termination of the State Tire contract. Galloway testified in substance that while nothing specific had been said about it, it might have been "inferred" that he could take State Tire's customers when the breakup came. He did actually divert to Shell a number of laundries and cleaners with substantial additional gallonage per month. In January, 1938, Shell threatened to cancel the contracts between it. and the State Tire· customers and forced State Tire to accept a reduction in commissions. State Tire operated at a loss thereafter, and requested cancellation of the contract. In response to this request, a letter from Shell's division manager dated July 15, 1938, but not received by Montesi until about a week thereafter, agreed to terminate all relations with State Tire, effective July 23, 1938. Shell, which had previously employed State Tire's former manager, Philyaw, and had him spend about 90% of his time on State Tire's accounts, prior to July 23d, ordered Philyaw to solicit State Tire accounts to continue purchasing Shell products. As a result of the contracts made by Shell with State Tire customers, which were not changed, and of the jobber arrangement with Galloway, Shell retained a substantial number of State Tire's consumer and reseller accounts after the contract was terminated.

We conclude that Shell's principal contentions have no merit. State Tire's theory of the facts is supported by Hickham and Philyaw, as well as by the failure of Von Allman to testify. Both the old and new reseller and consumer customers secured by State Tire and retained by Shell were stated by Hickham to be State Tire accounts. The contracts made with these customers were secured by fraudulent representations of Shell during the life of the contract with State Tire, that the contracts were a mere matter of form and, in effect, that the contracts would not affect State Tire's good will and its relation to its own customers. Hence it is immaterial that Shell delivery tickets were used in the sales of oil and gas and that leases were taken in Shell's name. Nor is it material that the consumer contracts were made directly with Shell, for Shell had secured the contracts by representing fraudulently that the customers were and should be considered State Tire customers.

There is substantial evidence in the record that Shell wrongfully interfered with State Tire's business. The solicitation of State Tire's customers by Shell during the period of the contract with State Tire, coupled as it was with misrepresentation relied on by State Tire, was unlawful.

■ "One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or refrain from action in reliance thereon in a business transaction is liable to the other for the harm caused to him by his justifiable reliance upon the misrepresentation." Restatement of Torts, § 525.

■■ This is also the law of Tennessee. Shwab v. Walters, 147 Tenn. 638, 251 S.W. 42; Hines v. Willcox, 96 Tenn. 148, 33 S. W. 914, 34 L.R.A. 824, 832, 54 Am.St.Rep. 823. Where a party intentionally or by design produces a false impression in order to mislead another, or to obtain an undue advantage of him, there is positive fraud in the fullest sense of the term. Rose v. Foutch, 4 Tenn.App. 495, certiorari denied by the Supreme Court of Tennessee May 7, 1927 and cases cited. Where there are "acts, omissions, or concealments which involve a breach of legal and equitable duty, trust or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another," there is actionable fraud. Smith v. Harrison, 2 Heisk. 230, 49 Tenn. 230; Bennett v. Massachusetts Mutual Life Ins. Co., 107 Tenn. 371, 64 S.W. 758.

In the Bennett case the court stated that a decree in favor of the complainant would be sustained upon the testimony of himself alone proving the real contract different from that expressed in the writings established where he showed the presence at the making of the contract of agents of the other party who were not offered to contradict him. This case is particularly apposite here, where Von Allman did not appear as a witness to give Shell's version of Montesi's protest against Shell's practice of obtaining contracts directly with State Tire's customers, and Von Allman's response thereto, and was not shown to be unavailable.

■ Shell was liable for damage caused by inducing customers not to continue their business relations with State Tire. Restatement of Torts, § 766; Hutton v. Wat-

ters, 132 Tenn. 527, 179 S.W. 134, L.R.A. 1916B, 1238, Ann.Cas.1916C, 433. Obviously the use of fraudulent representations was an improper means. Restatement of Torts, § 767, Comment on Clause (a); Bennett v. Massachusetts Mutual Life Ins. Co., supra; Smith v. Harrison, supra.

In the Hutton case, supra [132 Tenn. 527, 179 S.W. 135, L.R.A.1916B, 1238, Ann.Cas.1916C, 433], the court held: "Every one has the right to establish and conduct a lawful business, and is entitled to the protection of organized society, through its courts, whenever that right is unlawfully invaded. Such right existing, the commission of an actionable wrong is established against any one who is shown to have intentionally interfered with it, without justifiable cause or excuse."

These rules of law squarely apply here, where the jury could properly conclude from admitted facts that Shell induced State Tire to help it secure contracts with State Tire customers and to refrain from preventing Shell from obtaining contracts with State Tire customers by fraudulent representations both of fact and intention. Shell represented that the contracts were sought as a matter of policy, that it was merely a matter of form for the purpose of identifying the accounts, protecting them from competition by the major producers and facilitating credit. These were misrepresentations of present fact. That Shell also misrepresented its intention to respect State Tire's good will does not avoid its legal liability. German-American Monogram Mfrs. v. Johnson, 133 Tenn. 571, 182 S.W. 595; Walker v. Collins, 7 Tenn.App. 333, certiorari denied by the Supreme Court of Tennessee May 26, 1928. State Tire was justified in relying on such statements because Shell's agents both had and held themselves out as having special knowledge which State Tire did not have as to the methods of handling these accounts.

Ample evidence is presented that State Tire suffered damages by reason of the wrongful interference proven. While State Tire lost money prior to the termination of its relation with Shell, the major element in its financial difficulties in 1938 was the reduction of commissions by Shell. The record contains a tabulation of the accounts of State Tire customers for a period of six months before and after July, 1938, including customers solicited by Shell during the period of the contract and retained by it after July 23, 1938. Eliminating customers the loss of whose patronage might be due to other circumstances, there remain at least nine secured by Shell under the customer contracts, whose total average monthly gallonage is more than 60,000. On the basis of one cent per gallon, which is the lowest commission paid by Shell to State Tire, the earning on this minimum gallonage is $600 per month.

The trial court correctly charged the jury on the question of damages that it could consider evidence as to profits derived by State Tire from its business for a reasonable time prior to any wrongful conduct on the part of Shell and compare such profits with the reduced profits or losses ensuing as a direct result of the wrongful action of Shell toward State Tire. It is Shell's contention that this charge submits for the jury's consideration the question of loss of future profits of State Tire's entire business as an element of damage. Read as a whole and in connection with the evidence, the charge was not incorrect. The figures of profits from the business were so allocated that the jury could rightly find, as it evidently did, that certain specific diversions of customers to Shell, resulting in loss of gallonage sales, were directly caused by Shell's wrongful acts. It does not appear that the jury was misled. The fact that the damages, from the very nature of the tort, could be figured only approximately has no legal significance. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Walgreen Co. v. Walton, 16 Tenn.App. 213, 64 S.W. 2d 44, petition for certiorari denied by Supreme Court of Tennessee July 19, 1933.

The court instructed the jury that it should find for State Tire if from the preponderance of the evidence it found that Shell had interfered with State Tire's potential source of supply of petroleum products on the termination of the relations between the parties. Appellant contends that no evidence was presented justifying this charge. But Montesi testified that various nationally-known refineries were soliciting his business before the breakup with Shell. After July 23, 1938, the major companies said that they could not handle the account. This testimony is not successfully impeached and the jury was free to draw an inference of inter-

ference therefrom. The only supply that was and could be secured was with a company not so acceptable to State Tire's customers. The close working connection between the major companies testified to by Hickham supports Montesi's story upon this point, and the inference deducible therefrom.

The requested instructions upon liability for the interference with the business or good will of another without legal justification or by unlawful means were not erroneous. The attack upon this charge is based upon the proposition that the court used the word "or" rather than "and" in charging upon malice and lack of legal justification. This error, if such it was, could not possibly have misled the jury in this case, and hence is no ground for reversal. German-American Monogram Mfrs. v. Johnson, supra. The entire basis of the case was fraud; that is to say, interference by use of unlawful means, and the court, in the following sentences of the charge, fully and correctly explained that fraud, if proven, would constitute an illegal interference.

Nor was it error to credit the judgment in Shell's favor on the notes executed by State Tire and Montesi for $15,957.50 against the $20,000 verdict in favor of State Tire. The notes grew out of the same transaction as the cause of action pleaded by State Tire, and they were a proper subject of set-off.

The judgment is affirmed.