**W. T. ALLEN and Powell Oil Co., Inc.**

v.

**TOSCO, the Oil Shale Corp., Lion Oil Company and Monsanto Company.**

No. CIV–1–74–208.

United States District Court, E. D. Tennessee, S. D.

April 7, 1976.

Charles Gearhiser, Chattanooga, Tenn., for plaintiffs.

Raymond R. Murphy, Jr., Chattanooga, Tenn., for defendants.

## MEMORANDUM and ORDER

DUNCAN, District Judge, Sitting by Designation.

This is an action for fraudulent inducement to breach a contract, tortious interference with a business relationship, and violation of the federal antitrust laws. Jurisdiction lies pursuant to 28 U.S.C. §§ 1332 and 1337. The case came on for trial before a jury, and for three and one-half days plaintiffs presented their evidence in the form of several witnesses and voluminous exhibits. Plaintiffs then rested, and defendants moved to strike the testimony of Mr. James B. Frost, and for a directed verdict pursuant to Rule 50(a), Fed.R.Civ.P. The Court now rules upon these motions.

■ Mr. Frost, a certified public accountant, testified as an expert witness concerning the injury to plaintiffs' business which, plaintiffs allege, occurred as a result of defendants' unlawful conduct. The formula which Mr. Frost used to determine the "before and after" value of plaintiffs' Chattanooga enterprise was admittedly a rather tenuous one. The law concerning the admissibility of damages evidence in antitrust litigation is clear, however. As the Supreme Court stated in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969), "Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these

cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." The Court would also direct the attention of the litigants to the liberal provisions concerning expert testimony in the new federal evidence rules, Fed.R.Evid. rules 702, *et seq.* In view of the disposition which the Court makes of the directed verdict motion, I will not dwell further upon this evidentiary question, save to say that I find Mr. Frost's testimony admissible in the circumstances of this case, though perhaps marginally so.

■ The defendants' motion for a directed verdict requires that the Court view the evidence most favorable to the plaintiffs, and determine whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could reach in the case. *Simblest v. Maynard*, 427 F.2d 1 (2d Cir. 1970). If after so viewing the evidence and giving plaintiffs the benefit of all reasonable inferences therefrom, there is not substantial evidence in the record from which a jury could render a verdict in favor of plaintiffs, then it is the duty of the Court under federal law to direct a verdict in favor of the defendants. *Business Development Corp. v. United States*, 428 F.2d 451 (4th Cir.), *cert. denied*, 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 265 (1970). Keeping this standard of review in mind, the Court will endeavor to set out a brief outline of plaintiffs' proof in this case. A discussion of the law applicable to these facts will then follow.

Plaintiffs are W. T. Allen, a former resident of Chattanooga, Tennessee who now resides and does business in Alachua County, Florida, and Powell Oil Company, Inc., a Tennessee corporation which is now defunct. Defendants are Monsanto Company, a Delaware corporation; the Oil Shale Corporation, incorporated in Nevada; and Lion Oil Company, a Delaware corporation which is a wholly-owned subsidiary of defendant Oil Shale. Complete diversity of citizenship exists between the opposing parties, and the amount in controversy exceeds $10,000, exclusive of interests and costs.

During all relevant periods in question prior to October 1, 1972, W. T. Allen, as an individual, had three contracts (among other contracts not material herein) with Monsanto Company. One contract dealt with the wholesale distribution on a commission basis by Allen of Lion Oil gasoline and motor oils, and that contract will be referred to as the "distributorship contract". Another contract dealt with the sale to Allen by Monsanto of kerosene and diesel fuels and that contract will be referred to as the "jobber sales agreement". The third contract was for the sublease by W. T. Allen of a certain service station premises and that contract will be referred to as the "service station lease or sublease". Pursuant to the distributorship contract with Monsanto, Allen operated a bulk distribution plant in Chattanooga, Tennessee, which was under lease to Monsanto. Monsanto owned or was the lessor of service stations in the Hamilton County and Marion County area, which Monsanto leased or subleased to station operators in the area. These station operators, along with other customers, purchased gasoline from Monsanto through Allen under the distributorship contract, which gasoline was delivered by Allen from the bulk plant. In addition, Allen sold gasoline as a dealer from the service station premises that he leased under the "service station lease or sublease".

Effective October 1, 1972, Monsanto sold its oil refinery at El Dorado, Arkansas, inventory and substantially all of its petroleum marketing facilities and pipeline gathering systems and assigned all distributorship, jobbership or service station contracts or leases to TOSCO–Lion, Inc., a wholly-owned subsidiary of The Oil Shale Corporation. The sale was for approximately $25,000,-000.00 and was mostly financed as of October 1, 1972, with temporary financing from the First National Bank of St. Paul, Minnesota. Monsanto decided to assign to Oil Shale's subsidiary because the El Dorado refinery and the retail distribution system were not compatible with its long-range

140

corporate goals, and because these had not been profitable for Monsanto.

Monsanto did not wish to, and refused to, sell TOSCO–Lion, Inc. its crude oil production properties as a part of the purchase contract but did assign to TOSCO–Lion, Inc. certain crude oil division order purchase contracts then in existence which entitled TOSCO–Lion, Inc. to purchase crude oil sold by third parties. Neither The Oil Shale Corporation nor TOSCO–Lion, Inc. had a crude oil production facility of its own. However, at the insistence of TOSCO–Lion, Inc. Monsanto agreed and so entered into agreements with TOSCO–Lion, Inc. the same date as Monsanto sold the El Dorado refinery to TOSCO–Lion, Inc. requiring the Monsanto Company to supply for a period of five years TOSCO–Lion, Inc. approximately 50% of Monsanto's continental United States non-Arkansas crude oil production up to a maximum of 4,500 barrels per day together with approximately 1,750 barrels per day of crude oil produced by Monsanto in the State of Arkansas. In order to maintain its operations, TOSCO–Lion, Inc., and later Lion Oil Company, was dependent upon outside sources of crude oil and petroleum products in addition to the supply it was receiving from Monsanto.

Contingent upon the closing of the TOSCO–Lion, Inc.–Monsanto transaction, The Oil Shale Corporation entered into an agreement with Ashland Oil, Inc., wherein Ashland Oil, Inc. would loan The Oil Shale Corporation $6,500,000.00 and as a part of the consideration for that loan, TOSCO–Lion, Inc. would agree to sell to Ashland Oil, Inc. up to 2,000 barrels of gasoline and 1,000 barrels of diesel fuel per day processed at the El Dorado refinery through December 31, 1975. Also made a part of this transaction was a warrant allowing Ashland Oil, Inc. to purchase 200,000 shares of The Oil Shale Corporation stock at $5.00 per share. The Ashland–Oil Shale Corporation agreement became effective upon the closing of the TOSCO–Lion, Inc.–Monsanto transaction.

On June 22, 1973, Lion Oil Company (successor to TOSCO–Lion, Inc.) entered into a written petroleum product sales agreement with M.F.A. Oil Company whereby M.F.A. Oil Company would loan to Lion Oil Company $6,500,000.00 at 6¼% per annum and as a part of the consideration therefor Lion Oil Company would agree to sell and supply M.F.A. Oil Company 3,000 barrels of gasoline and diesel fuel per day commencing July 1, 1973, and continuing for five years until and including June 30, 1978.

On March 12, 1973, Lion Oil Company advised its distributors and jobbers including Allen that there would be a voluntary allocation of gasoline, kerosene, diesel fuel and naphtha. In his letter of March 12, 1973, Mr. L. D. Sullivan, Lion Oil's Director of Branded Sales, did not inform Mr. Allen and other Lion distributors that Lion Oil had entered into the agreements with Ashland Oil and M.F.A. Oil Company. He did state, emphasis in original: "But, again, we are *not* reducing your purchases to give to others; rather *we have been cut off* by our outside sources of supply". The latter portion of this statement was in fact true, because the nascent oil shortage in this country had sharply diminished Lion Oil's outside sources of petroleum. The jury could find from the evidence that the former portion of the statement was not wholly accurate, because Lion Oil's supply of petroleum was in fact significantly diminished by its agreements to supply Ashland Oil and M.F.A. Oil Company with specified amounts of gasoline and diesel fuel.

At trial, plaintiffs emphasized that prior to the March 12, 1973 letter, and unmentioned in it, Lion Oil had indicated to Equitable its intention to dispose of certain properties involved in its retail distribution system. Equitable agreed that these properties would not be subject to the indenture agreement on the condition that proceeds from any sale of such retail distribution properties would be paid to Equitable.

It must also be noted, in connection with Lion Oil's March 12, 1973, notification to Allen and other distributors that their allocations were being decreased to approximately 75% of their purchases in 1972, that the distributorship contract which was in

effect between Allen and Lion Oil provided, in part, that "Lion shall not be under obligation to furnish or be liable for damages or otherwise for failure to furnish any particular product or any particular quantity thereof." The agreement also provided that "either Distributor or Lion may terminate this agreement with or without cause at any time without previous notice. . ."

On or about April 12, 1973, The Oil Shale Corporation and the Lion Oil Company closed the permanent financing with reference to the Monsanto transaction by obtaining a loan of $15,000,000.00 from the Equitable Life Assurance Society.

On March 23, 1973, the Lion Oil Company through its Eastern Area Manager, Charles F. Bradley, obtained the termination of each lease or sublease with the five service station operators then operating in Marion County and Hamilton County, Tennessee, with the execution of a written legal document. Mr. Bradley orally informed Mr. Allen and other retail dealers whose contracts were being terminated that the reason for Lion Oil's action was the oil shortage. The distributorship contract and the jobber sales agreement with Allen were not terminated at that time, although Mr. Allen's distributorship enterprise was effectively and substantially curtailed because the service station leases or subleases of his distributees were terminated by Lion Oil. On March 23, 1973, Allen entered into what will be referred to as R.C.D. contracts, or retail commission dealer contracts with Lion Oil Company with reference to two service stations in Chattanooga, Tennessee. At the same time Allen likewise entered into a service station sublease with reference to each service station premises. Under the R.C.D. contracts Allen sold Lion Oil gasoline through the service stations on a commission basis. Allen's allocation from Lion Oil for his R.C.D. stations was based upon the 1972 base period for gasoline sold through Allen's *entire* distributorship for 1972. At no time while Allen was operating under the R.C.D. agreements was he ever refused gasoline to be sold through his service stations. Mr. Allen was permitted by Lion Oil to continue to distribute gasoline to another retail dealer, as long as he pumped the gasoline through his R.C.D. station pumps in the first instance. From March 23, 1973, on, neither Allen nor anyone else operated the bulk plant for the distribution of wholesale gasoline.

Under the R.C.D. contracts, Allen was furnished a "suggested retail price" by Lion Oil. If he sold the gasoline below the suggested retail price, the difference was deducted from his commission. If he sold the gasoline for more than the suggested retail price, he kept the difference, in addition to his commission. The agreements expressly provided that Allen could set his retail price at any figure he desired. From June, 1973, though March, 1975, under one R.C.D. agreement, and from February, 1974, until he terminated the other R.C.D. agreement, plaintiff Allen sold Lion gasoline for *more* than the suggested retail price suggested by Lion Oil.

During the period 1962 through 1974, first Monsanto, and then Lion Oil Company, continually lost money in the Chattanooga area operations. During the period 1973 through 1975, Lion Oil sales accounted for approximately 1% of the retail gasoline market in Hamilton County, Tennessee area. During the period 1962–1975, the Hamilton County retail gasoline market was a very highly competitive one, with "gas wars" taking place from time to time.

On April 8, 1975, Mr. Allen by his attorney terminated "his various remaining contractual arrangements with Lion Oil Company."

## DISCUSSION

At the outset of the Court's discussion of the legal principles applicable to this case, it is important to observe that the theories of recovery upon which plaintiffs proceeded at trial had undergone a substantial metamorphosis from those originally alleged in the complaint, and indeed from those set out in the final pretrial order entered by agreement of the parties. Plaintiffs' original contentions that defendants had violated

Section 2 of the Sherman Act, 15 U.S.C. § 2, Section 2 of the Clayton Act, 15 U.S.C. § 13, and the Emergency Petroleum Allocations Act of 1973, 15 U.S.C. §§ 751–756, were dropped before trial, as was their contention that defendants had breached one or more contractual agreements with plaintiff W. T. Allen. Plaintiffs proceeded at trial on only the following three theories of recovery: (1) that defendants, together with Ashland Oil, Inc., and M.F.A. Oil Company, and perhaps others, unlawfully combined and conspired to restrain trade among the several states, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) that defendants Monsanto and The Oil Shale Corporation, together with M.F.A. Oil Company and Ashland Oil Inc., and perhaps others, unlawfully induced Lion Oil Company to breach the distributorship contract which it had with Allen, in violation of Tennessee law, T.C.A. § 47–15–113; and (3) that defendants, together with Ashland Oil, Inc., and M.F.A. Oil Company, and perhaps others, tortiously interfered with plaintiffs' business, in violation of the common law of the State of Tennessee.

■ The Court on this record finds no evidence from which the jury could find that the defendants, or any of them, engaged in an unlawful restraint of trade. The evidence would support a finding that when Lion Oil Company secured the termination of the five service station leases or subleases in the Chattanooga area on March 23, 1973, Mr. Allen's distributorship enterprise was necessarily and substantially injured. Lion Oil's termination of the leases or subleases of Allen's distributees, together with its insistence that any future "wholesale" distribution of gasoline by Allen be through the retail pumps at his R.C.D. stations, effectively destroyed his distributorship enterprise. But injury alone does not constitute a violation of the Sherman Act. "Unless it can be said that the refusal to deal with plaintiff had the result of suppressing competition and thus constituted 'restraint of trade' within the meaning of Section 1 of the Sherman Act, there is no violation of the Act." *Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283, 287 (6th Cir. 1963). *See also, Mullis v. Arco*

*Petroleum Corporation,* 502 F.2d 290 (7th Cir. 1974) (Stevens, J.). Certainly the evidence would support no finding of a *per se* violation. Lion Oil's share of the retail gasoline market in the plaintiffs' geographical marketing area was so insubstantial, and the market so highly competitive, that Mr. Allen's continued presence in the market as a wholesale distributor of Lion Oil gasoline was wholly immaterial to competition in that market. Assuming, arguendo, that the Ashland Oil and M.F.A. Oil supply agreements entered into by Lion Oil had as their purpose and effect the strangulation of plaintiffs' distribution enterprise, the evidence would not support a finding that this result had any significant impact upon the subject market. Nor is there any evidence in this case that Ashland Oil or M.F.A. Oil distributed any petroleum products anywhere in the State of Tennessee, or more particularly, in plaintiffs' geographical area. The jury, then, could not properly find that Lion Oil's actions of March 23, 1973, were an unreasonable restraint of trade.

■ Plaintiffs' contention that the defendants unlawfully allocated the petroleum products of the El Dorado, Arkansas refinery is similarly without merit. There simply is no evidence in this case that either Monsanto's agreement with Oil Shale's subsidiary, or Oil Shale and Lion Oil's agreements with Ashland Oil, Inc. and M.F.A. Oil Company, had any anti-competitive purpose or effects. And Lion Oil's March 12, 1973, allocation program was applied evenly among all its retail outlets nationwide.

Plaintiffs also contend that Monsanto unlawfully tied the sale of 6,200 barrels of crude oil per day from its crude oil supply to the sale of its refinery, inventory and distribution systems to Oil Shale's subsidiary, and that Oil Shale and Lion Oil unlawfully tied the sale of 3,000 barrels of petroleum product per day to both Ashland Oil and M.F.A. Oil in return for the purchase by Oil Shale and Lion Oil of credit. The evidence would not support a finding, however, that Monsanto, Oil Shale, or Lion Oil insisted upon the purchase of petroleum products by Oil Shale, Ashland Oil, or M.F.A. Oil, respectively. The evidence sup-

ports only a finding that the *buyer* in each of these relationships insisted upon the allocation of petroleum products as part of the agreements, not the *seller*.

■ Plaintiffs' final contention under Section 1 of the Sherman Act appears to be that the suggested retail price device used by Lion Oil under the R.C.D. contracts with Allen constituted unlawful price fixing, a *per se* violation of the Act. Yet, it is clear in the first place that Allen was empowered under these contracts to set his retail price at any level he chose, and in the second place that he did so, consistently at a price which was higher than the one suggested by Lion Oil. There is no evidence present here that Lion Oil ever retaliated against Allen for setting his prices below the suggested retail price, if in fact he ever did. This case is therefore not within the boundaries of *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26 (5th Cir.), *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972); and like cases. The evidence shows only that Lion Oil established from time to time the price at which it was willing to wholesale to Allen its own product, and left him free to retail it at any price he desired. The Court finds no basis on these facts for submission of any price fixing element of plaintiffs' Sherman Act allegations to the jury, nor any basis for any other *per se* violation.

■ Finding, then, a complete absence of evidence, substantial or otherwise, tending to show that any unlawful restraint of trade ever occurred in this case, the Court does not reach the question, to which much of plaintiffs' proof was directed, whether the defendants and others conspired amongst themselves to perpetrate the alleged restraint of trade. Put briefly, no number of combinations and conspiracies is prohibited by the Act if not in furtherance of an unlawful restraint of trade.

■ Plaintiffs' remaining contentions are that defendants tortiously interfered with their business, and that Lion Oil was unlawfully induced to breach the distributorship contract it had with Allen. These will be considered in tandem. An essential ele-

ment of a claim of unlawful inducement to breach a contract under the Tennessee statute is, of course, the breach of a contract. *Dynamic Motel Management, Inc. v. Erwin*, 528 S.W.2d 819, 822 (Ct.App.Tenn.1975). And in order that a cause of action sounding in tort be proved, whether it be the tort of interference with business or otherwise, there must be a breach of legal duty owed by the defendant to the plaintiff. *Shell Oil Co. v. State Tire & Oil Co.*, 126 F.2d 971, 974–75 (6th Cir. 1942). Since such a legal duty may arise because of the contractual relations of the parties, *cf. State Tire, supra,* a determination whether there is sufficient evidence in this case for the jury to find that Allen's distributorship contract was breached by Lion Oil will be a step toward determining whether anyone tortiously interfered with plaintiffs' business.

As was noted earlier, the relevant distributorship contract provided that Lion Oil was under no duty to provide Allen any particular product or quantity thereof. The agreement itself was also terminable at the will of either party without any notice. Both provisions are facially clear and unambiguous, and plaintiffs do not contend that the provisions are unenforceable or in need of interpretation. If Lion Oil's securing of termination agreements from Allen's distributees, and the concomitant effect of this action upon plaintiffs' distributorship enterprise, was a breach of this contract, then something must have operated to annul the provisions in the agreement which provided that Lion Oil was not contractually bound to supply particular quantities of petroleum to Allen, or even to continue with the relationships. If Lion Oil's decision to terminate, in effect, the distributorship agreement had left it in the position of reaping added profits directly attributable to Allen's labors, then the Court might be justified in charging the jury that Lion Oil could not terminate except in good faith. *See, Randolph v. New England Mutual Life Insurance Co.*, 526 F.2d 1383 (6th Cir. 1975). Yet, even were such a charge appropriate under the facts of this case—and I do not believe that it would be—it is unlikely that the facts which plaintiffs have adduced would support a finding that Lion Oil acted

in bad faith. Since Lion Oil had been losing money in the Hamilton County area after the assignment by Monsanto, the closing of three unprofitable service stations and the conversion of the two remaining ones to commissioned dealer operations may well have been justifiable on sound business grounds. The evidence does not show how Lion Oil's revealing the fact of the Ashland Oil and M.F.A. Oil agreements to Allen would have altered in any way the course of events which in fact transpired.

In summary, then, the Court finds no breach of any contract on these facts which a jury might find to have been induced by any of the defendants. I further find no evidence tending to show that any of the defendants, acting alone or in concert, owed any duty to plaintiffs or their business which the jury could find was breached by Oil Shale or anyone else. The defendants' motion for directed verdict is accordingly well-taken.

It is ORDERED that defendants' motion to strike the testimony of James B. Frost be, and it hereby is DENIED, and it is ORDERED that defendants' motion for directed verdict be, and it hereby is GRANTED.