**W. T. ALLEN and Powell Oil Co., Inc., Plaintiffs-Appellants,**

**v.**

**OIL SHALE CORPORATION, Lion Oil Co., and Monsanto Co., Defendants-Appellees.**

No. 76–1969.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 13, 1977.

Decided Feb. 13, 1978.

Charles J. Gearhiser, Gearhiser, Carpenter & Peters, Chattanooga, Tenn., for plaintiffs-appellants.

Miller, Martin, Hitching, Tipton, Lenihan & Waterhouse, Chattanooga, Tenn., for defendants-appellees.

Before PHILLIPS, Chief Judge, PECK and MERRITT, Circuit Judges.

PER CURIAM.

This is an appeal by plaintiffs[1] from a directed verdict for defendants[2] in this action charging fraudulent inducement to breach a contract, tortious interference with a business relationship, and violation of the federal antitrust laws. The well-rea-

---

1. Plaintiffs are W. T. Allen and Powell Oil Co., Inc., a business owned by Allen. Plaintiffs hereinafter will be referred to as Allen.

2. Defendants are Monsanto Corp., the Oil Shale Corp., and Lion Oil Co., a wholly-owned subsidiary of Oil Shale.

soned and comprehensive opinion of District Judge Robert M. Duncan [3] is reported at 442 F.Supp. 137 (E.D.Tenn.1977). Reference is made to the opinion of the district court for a detailed recitation of pertinent facts, which we summarize briefly.

In 1972, Allen was an oil distributor for Monsanto and operated a bulk oil distribution plant for Monsanto in Chattanooga, Tennessee. Allen also operated a service station for Lion Oil Company, a Monsanto subsidiary. In October 1972, Monsanto sold the assets, marketing facilities, and name of Lion Oil Company to a wholly-owned subsidiary of Oil Shale Corporation, Tosco-Lion, Inc. (hereinafter Lion). Monsanto also sold Lion its oil refinery and agreed to supply Lion with fifty percent of Monsanto's crude product for five years. In order to finance the purchase of these assets, Lion obtained $13,000,000 in loans from Ashland Oil Company (Ashland) and M.F.A. Oil Company (M.F.A.) and repaid these loans by supplying to each of them 3,000 barrels of gasoline and diesel fuel per day for a period of time sufficient to repay the loans with interest.

In March 1973, Lion advised its distributors and jobbers, including Allen, that there would be a "voluntary" allocation of petroleum products due to short supply. Lion, however, did not advise the distributors of the agreements with Ashland and M.F.A. The letter of notification stated in part:

> But, again, we are *not* reducing your purchases to give to others; rather *we have been cut off* by our outside source of supply. (emphasis in original).

Subsequently, Lion decided no longer to sell gasoline through the distributorship contract with Allen and closed his bulk distributorship plant and three service stations in the Chattanooga area. Allen's distributorship contract provided in part:

> (4) Lion shall not be under obligation to furnish or be liable for damages or otherwise for failure to furnish any particular product or any particular quantity thereof.

\*　　\*　　\*　　\*　　\*　　\*

(17) This agreement shall continue at the will of the parties and either distributor or Lion may terminate this agreement with or without cause at any time without previous notice  .   .   . .

Lion thereafter offered and Allen accepted retail dealer's commission contracts for the two remaining high volume stations in the area. Under the contracts, Allen sold gasoline for Lion on a commission basis through the service stations and was permitted to continue distributing gasoline to another retail dealer as long as he pumped the gasoline through his retail dealer's commission pumps in the first instance. Under the contracts, Lion furnished Allen a suggested retail price. If he sold gasoline below this price, the difference was deducted from his commission. If he sold gasoline for more than the suggested price, he kept the difference, in addition to his commission. From June 1973 through March 1975 under one contract and from February 1974 until he terminated the other contract, Allen sold gasoline for more than the suggested price. In April 1975, Allen terminated all remaining contractual arrangements with Lion.

At trial, Allen contended that: (1) defendants, together with Ashland and M.F.A., combined and conspired to restrain trade in violation of the Sherman Act, 15 U.S.C. § 1; (2) defendants Monsanto and Oil Shale, together with Ashland and M.F.A., unlawfully induced Lion to breach the distributorship contract with Allen in violation of T.C.A. § 47–15–113; and (3) defendants, together with Ashland and M.F.A., tortiously interfered with his business.

Judge Duncan held that the contracts between Lion and Allen were terminable by either party at will and that the contracts between Lion and Ashland and M.F.A. did not have an anti-competitive purpose or effect.

For the reasons set forth in the opinion of Judge Duncan, we conclude that the directed verdict was properly granted.

Affirmed.

**3.** Of the Southern District of Ohio, sitting by designation.